**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PHILLIP HARTSFIELD (R46473),

        Petitioner,

        v.

RANDY PFISTER, Warden,
Pontiac Correctional Center,

        Respondent.

Case No. 14-cv-5816

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Petitioner Phillip Hartsfield brings a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, challenging his state court convictions for murder and home invasion. Petitioner is currently serving a 45-year prison term on the murder conviction and a consecutive 6-year prison term on the home invasion charge. An IDOC inmate search shows that he is currently being held at Pinckneyville Correctional Center. For the reasons explained below, this Court denies the petition, and declines to issue a certificate of appealability.

## I. **Legal Standard**

Federal review of state court decisions under § 2254 is limited. With respect to a state court's determination of an issue on the merits, habeas relief can be granted only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). This Court presumes that the state court's account of the facts is correct, and Petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012).

State prisoners must give the state courts "one full opportunity" to resolve any constitutional issues by "invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If a petitioner asserts a claim for relief that he did not present in the first instance to the state courts, the claim is procedurally defaulted and "federal courts may not address those claims unless the petitioner demonstrates cause and prejudice or a fundamental miscarriage of justice if the claims are ignored." *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010).

## II.   Background and Procedural History

This Court begins by summarizing the facts and procedural posture from the state court record [14] (attaching Exhibits A to X), including the Illinois Appellate Court's opinions on direct appeal, *Illinois v. Hartsfield*, No. 1-05-2782 (Ill. App. Ct. March 28, 2007) ([14] Ex. A), and post-conviction review, *Illinois v. Hartsfield*, No. 1-12-0155 (Ill. App. Ct. Sept. 13, 2013) ([14], Ex. J). This Court presumes that the state court's factual determinations are correct for the purposes of habeas review, as Petitioner does not point to any clear and convincing contrary evidence. 28 U.S.C. § 2254(e)(1); *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C.

2254(e)(1)). Indeed, here Petitioner does not contest the state appellate court's factual findings. [1] at 6-11.

This case arises out of the January 4, 2004 murder of Alejandro Martinez. Petitioner and his co-defendant, Mohammed Abukhdeir, were simultaneously tried before separate juries for first-degree murder and home invasion in connection with Martinez' death. [14] Ex. J at 2. The evidence at trial established that, in the wee hours of the morning on January 4, Martinez was partying with several friends at his home at 5530 South Kolin in Chicago. [14] Ex. J at 2. Claudia Garcia testified at trial that she was at a party up north with some friends when her boyfriend, Steven Howard, called her and asked her to come to Martinez' house. [14] Ex. A at 2. Garcia arrived at the party at approximately 3 a.m. with her friends, Candy Richmond and Kristina Kasper. *Id.* Martinez, Howard, and two of Martinez' friends, Raul Flores and Hector Canternin, were at the party when the women arrived. [14] Ex. A at 2.

After a while, Garcia and Howard went into the bathroom. *Id.* Kasper used Richmond's cell phone to call Petitioner, with whom Kasper was having a sexual relationship. *Id.* While on the call, Kasper heard Petitioner with another woman and became angry. *Id.* at 1-2. After the call, Kasper told Richmond about the conversation in front of Flores and Canternin. *Id.* at 2. They then asked Kasper why she was dating "a black guy" (Petitioner is African-American), and an argument ensued between Kasper, Flores, and Canternin. [14] Ex. J at 2. After about 15 minutes, Richmond knocked on the bathroom door and told Garcia that

3

she wanted to leave. *Id.* Garcia came out of the bathroom and saw Kasper fighting with Flores. [14] Ex. A at 2. Richmond was also yelling at Flores and Canternin, calling them derogatory terms for Mexicans. *Id.* As the three women were leaving, Richmond and Kasper continued to yell at them. [14] Ex. J at 2-3. Howard followed the women to the car and "smacked" both Kasper and Richmond. *Id.* at 2; [14] Ex. A at 3. The women left in Garcia's car at approximately 4:30 or 5:00 am. [14] Ex. A at 2; [14] Ex. J at 3.

While in the car, Richmond and Kasper made several phone calls. [14] Ex. J at 3. Garcia testified that Richmond called someone, gave them the victim's address, and encouraged the person on the other end of the line to take retaliatory action against the men at the party. *Id.*; [14] Ex. A at 2. Garcia also testified that someone from the party called Richmond and Richmond said, "Don't worry about it. I got you motherfuckers." [14] Ex. A at 2. The person that called was Raul Flores. *Hartsfield*, order at 2. Kasper testified that either she or Richmond called Petitioner and gave him the Martinez' address. [14] Ex. J at 3; [14] Ex. A at 4. At trial, the parties stipulated to telephone records showing calls between Richmond's cellphone number and Petitioner's cellphone number on the morning of January 4. [14] Ex. T at 844-846.

Candy Richmond also testified at trial; she denied that she encouraged Petitioner to kill anyone or that she threatened to have anyone killed. She also denied that she told Flores "I got you" after leaving the party. [14] Ex. A at 3. Richmond testified that, after she arrived home at 5:30 or 6:00 a.m., she received

calls from Petitioner, Garcia, and Kasper.  *Id.*  She testified that Petitioner picked her up at around 7:00 a.m. in a silver four-door car.  *Id.*  Abukhdeir was also in the car.  *Id.*  They picked up Kasper and proceeded to Martinez' house, arriving around 7:30 a.m.  *Id.*  Richmond testified that, when they arrived, Petitioner exited the car and rang the front doorbell.  *Id.*  No one answered and Petitioner returned to the car and opened the trunk.  *Id.*; [14] Ex. J at 3.  Richmond testified that Petitioner then retrieved a silver gun from the trunk.  [14] Ex. A at 3; [14] Ex. J at 3.  Richmond testified Petitioner and Abukhdeir proceeded down a gangway adjacent to Martinez' house and returned to the car five minutes later.  [14] Ex. A at 3.

Richmond testified that Petitioner and Abukhdeir were laughing as they got into the car.  *Id.*; [14] Ex. J at 3.  She thought she saw blood on Abukhdeir's knuckles.  [14] Ex. J at 3.  Richmond heard Abukhdeir say "he has blood all over him."  *Id.*  Petitioner told Abukhdeir to "shut the fuck up" and Abukhdeir said, "If it wasn't for me, you wouldn't have gotten through the back door."  *Id.*  Richmond also heard Abukhdeir say, "I hope you did it right."  *Id.*  Kasper testified that she did not hear this conversation but did observe a gun in Abukhdeir's lap.  [14] Ex. J at 3; [14] Ex. A at 3-4.

Richmond also testified that, at one point, petitioner stopped the car, took the gun from Abukhdeir, and put the gun in the trunk.  [14] Ex. J at 3-4.  They drove to another house, which Richmond believed to be Abukhdeir's.  [14] Ex. A at 3.  Petitioner opened the trunk and Abukhdeir went into the house then came back to the car. *Id*.  Kasper's testimony did not mention either stop.  *Hartsfield*, order at 4;

[14] Ex. P at 337-339. Petitioner and Abukhdeir then dropped off Kasper and Richmond. *Id.* Richmond further testified that as Petitioner was dropping her off, Petitioner told Richmond: "You're my girl but I'll kill you." [14] Ex. A at 3-4; [14] Ex. J at 4. When Richmond asked Petitioner what he had done, he said "Nothing." [14] Ex. A at 4; [14] Ex. J at 4. Both Richmond and Kasper had been drinking that night. [14] Ex. J at 3. Richmond acknowledged that she did not hear any gunshots and did not see a silencer. [14] Ex. O at 238.

Katherine Chrzan testified that, at the time of the murder, she was pregnant with Petitioner's child and drove a silver four-door Chevrolet in 2004. [14] Ex. J at 4; [14] Ex. A at 4. Around 4:30 a.m. on January 4, 2004, Petitioner picked up Chrzan from a friend's house in her car. [14] Ex. A at 4-5; [14] Ex. J at 4. Abukhdeir was in the back seat. [14] Ex. A at 5. Chrzan testified that Petitioner then received a phone call, and that Chrzan could hear a female voice coming through the line. *Id.* Petitioner told the caller he would be there in twenty minutes. *Id.* Petitioner drove to his house; Chrzan and Petitioner went to Petitioner's bedroom while Abukhdeir stayed in the car. *Id.* In his bedroom, Petitioner retrieved a shotgun from under his bed. *Id.* He left Chrzan at his house around 6:30 or 7:00 a.m. and returned at 9:00 or 9:30 a.m. *Id.* Petitioner and Chrzan then slept until 6:00 p.m. *Id.*

On cross-examination, Chrzan testified that when Petitioner returned home, there was nothing unusual about his clothing and she did not see any blood either on Petitioner or in her car. [14] Ex. O at 125-127.

That evening, Chrzan noticed that her car's gas tank was almost empty. *Id*. She asked Petitioner where he had driven the night before. [14] Ex. A at 5. Petitioner said he went to Chicago, but that if he told her what happened, she "wouldn't want to come around anymore," and that "if he ever went to jail for murder, he would kill himself." *Id*. Chrzan further testified that the same night, she overheard Petitioner on the phone ask if "Sally" was registered. *Id*. Chrzan understood that "Sally" was a gun. *Id*. On January 6, 2004, Chrzan and Petitioner were approached by police officers outside the Maywood courthouse. *Id*. Chrzan consented to a search of her car. *Id*.

John Waszak, a friend of Petitioner and Abukhdeir, also testified at trial. He testified that, on the evening of January 6, he was at Billy Thompson's house along with Abukhdeir. [14] Ex. A at 6. Waszak testified that, while at Thompson's house, Abukhdeir gave him a sock tied up with a knot at the top; the sock contained a gun barrel and shell casings. [14] Ex. A at 6; Ex. R at 649. Waszak testified that his girlfriend drove him to the Ogden Bridge over the Des Plains River in Lyons and he threw the sock in the river. *Id*. Before he disposed of the sock, Waszak looked inside and saw a .40 caliber gun barrel, spent casings, and live shells. [14] Ex. A at 6; Ex. R at 651. Waszak recognized the gun; he identified it as the gun called "Sally" that he previously sold to Abukhdeir. [14] Ex. A at 6; Ex. R at 652. Waszak admitted that he had prior convictions for residential burglary, possession of a controlled substance, forgery, and domestic battery. Ex. A at 6.

Laura Vega, the victim's aunt, also testified at trial. She testified that she lived in the basement apartment of the victim's house. [14] Ex. A at 5. She testified that she returned home from a night of dancing at 4:00 a.m. on January 4, 2004, saw the lights on upstairs, and heard men and women talking. *Id.* She did not hear Martinez's voice. *Id.*; Ex. Q at 414, 431-432. At that time, she did not notice anything unusual about the back door. *Id.* Vega went to bed soon afterward, awoke briefly at 9:00 a.m., and eventually got up at noon. *Id.* She walked upstairs to ask Alberto Martinez, the victim's brother who also lived in the house, if he wanted to share a pizza. *Id.* He declined and said the victim was still sleeping. *Id.* Vega testified that she did not hear any gunshots or pounding on the door that morning. *Id.*

Alberto Martinez, the victim's brother, testified that he returned home at 11:30 a.m. on January 4, 2004 after spending the night out. [14] Ex. A at 6. He testified that, at some point, he yelled to the victim, and, when the victim failed to respond, Martinez thought he was sleeping. *Id.* Alberto Martinez testified that, at about 6:00 p.m. that day, he attempted to wake the victim and found him dead in his bed. *Id.*

Detective Jim O'Brien, one of the police detectives who investigated the murder, testified that he arrived at the victim's house at 6:00 p.m. on January 4, 2004. *Id.* The condition of the victim's body and the scene indicated that the victim had not been moved after he was killed. *Id.* Detective O'Brien testified that the back door was split and appeared to have been kicked or forced open. *Id.* A forensic

scientist examined the backdoor to the victim's house but found no blood or other biological materials on the door. [14] Ex. A at 7; Ex. R at 593-594.

Detective Daniel McNally, another investigator, testified that he searched Chrzan's car after obtaining her consent, where he found Abukhdeir's identification card. [14] Ex. A at 6. After securing a search warrant for Abukhdeir's house, the detective found a .40 caliber Cal Tech pistol loaded with eight live rounds and a box of .40-caliber Speer brand bullets in a basement bedroom. *Id*. at 6-7. Abukhdeir's brother provided a receipt for the gun and a Firearm Owner's Identification (FOID) card in his name for the gun. *Id*. at 7. In another basement bedroom, the detective found Abukhdeir's identification and a pair of bloodstained Jeans. *Id*.

The assistant medical examiner (ME) testified that the victim's body was autopsied at 8:15 a.m. on January 5, 2004. [14] Ex. A at 7. The ME determined that the victim sustained four gunshot wounds: one close-range shot to the left cheek, which exited the back of his head; one close-range shot to his left neck, which lodged in the victim's right shoulder muscle; one shot to his left forearm, which fractured his ulna; and one shot to his left thumb. *Id*.; Ex. R at 608. The ME testified that the only bullet recovered from the victim's body was the one lodged in his shoulder muscle. The ME could not be certain of the exact time of death, but testified to a degree of medical certainty that the cause of death was the victim's gunshot wounds. *Id*.

Forensic scientist Julie Steele testified that one .40 caliber bullet was recovered from the victim's body and two fired .40 caliber Speer brand bullet

casings were recovered from the scene for testing. *Id*. Steele testified that she could not identify or eliminate the Cal Tech pistol found in Abukhdeir's house as the gun that fired the bullet recovered from the victim's body. [14] Ex. A at 7-8; [14] Ex. J at 6. Additionally, the bullets recovered from Abukhdeir's house had silver casings while those found at the scene of the murder had brass casings. Ex. A at 7-8.

The jury convicted Petitioner on both counts. The trial judge sentenced him to 45 years on the murder charge and 6 years on the home invasion charge, with the sentences to run consecutively.

Petitioner appealed, arguing that: (1) he was not proven guilty of the charges beyond a reasonable doubt; (2) the trial court erred in admitting Detective O'Brien's testimony as to what Richmond, Kasper, Waszak, Howard, Flores and Canternin said when he questioned them, because such statements were inadmissible hearsay; (3) the trial court erred in admitting the gun and ammunition found at co-Defendant's house, as well as evidence of the ballistics tests performed on that gun; (4) the trial court erred in admitting Chrzan's testimony that Petitioner was arrested outside of the Maywood courthouse because the statement amounts to impermissible other crimes evidence; and (5) certain comments made by the prosecutor in closing arguments were improper. *See* [14] Exs. A, B. The Appellate Court rejected these challenges and affirmed Petitioner's conviction. [14] Ex. A. Petitioner then filed a petition for leave to appeal (PLA), raising all of these same arguments, and the Illinois Supreme Court denied the PLA. See [14] Exs. E, F.

Petitioner filed a *pro se* post-conviction petition claiming that his trial counsel was ineffective because he usurped Petitioner's right to testify and failed to call Billy Thompson, Amjud Abukhdeir, and Maria Vega as witnesses. With the assistance of counsel, Petitioner filed an amended post-conviction petition, claiming that trial counsel was ineffective for usurping Petitioner's right to testify and for failing to call Billy Thompson to testify, and that trial and appellate counsel were ineffective for failing to challenge the admission of Candy Richmond's hearsay testimony about Abukhdeir's inculpatory statements. [14] Ex. J at 6-7. The trial court dismissed the petition, finding that the claims lacked merit. *Id.* at 7.

Petitioner appealed that dismissal, represented by the State Appellate Defender's Office, raising the same claims he raised in his amended post-conviction petition and also arguing that his post-conviction counsel was ineffective when he abandoned the claim made in Petitioner's *pro se* post-conviction petition that trial counsel was ineffective for failing to present testimony from Amjad Abukhdeir, who owned the gun introduced at trial. [14] Ex. G at 2, 32-34. The Appellate Court affirmed the dismissal of the petition. [14] Ex. J. Petitioner then filed a PLA with the Illinois Supreme Court, and the Supreme Court denied the PLA on January 29, 2014. [14] Exs. K, L.

Petitioner then filed this habeas corpus petition [1] on July 29, 2014.

### III.  Analysis of Petitioner's Claims

In the habeas corpus petition he filed with this Court, Petitioner asserts seven claims. In claim one, Petitioner asserts that the State failed to prove him

11

guilty of the offenses of home invasion and first degree murder beyond a reasonable doubt. In claim two, he claims that the trial court erred in allowing the introduction of hearsay statements of six of the State's witnesses. In claim three, Petitioner claims that the trial court erred in allowing the State to introduce evidence of a handgun and ammunition recovered from the home of co-Defendant, as well as evidence of ballistics examinations conducted on the gun. In claim four, he asserts that the trial court erred in allowing the State to introduce evidence that Petitioner was arrested for the instant offenses as he was exiting the Maywood Courthouse. In claim five, he claims that the State's closing and rebuttal closing arguments were improper and constitute reversible error. Finally, in claims six and seven, he claims that his trial counsel was ineffective when he usurped his right to testify in his own behalf and failed to call Billy Thompson to the stand to testify on Petitioner's behalf to undermine the trial testimony of John Waszak.

Petitioner is currently serving 45 years for first degree murder, with a consecutive six years for home invasion. He filed Writ of Habeas Corpus which includes seven claims and states that he is being improperly imprisoned. The Court considers each claim below.

A.    Claim One

Petitioner first argues that he was not proven guilty beyond a reasonable doubt of the offenses of home invasion and first degree murder. Respondent correctly argues that this claim is meritless. On appeal, the Appellate Court reasonably concluded that any rational jury could have convicted petitioner of the

murder and home invasion of Martinez. A reviewing court must uphold a conviction as constitutional if, when viewing the evidence in the light most favorable to the state, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Moreover, a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326).

Federal habeas review of a sufficiency-of-the-evidence claim adds "an additional layer of deference onto this inquiry." *Monroe v. Davis*, 712 F.3d 1106, 1119 (7th Cir. 2013). A state court decision rejecting a sufficiency challenge may not be overturned "unless the decision was objectively unreasonable." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (internal quotation marks and citation omitted); *see also Williams v. Thurmer*, 561 F.3d 740, 743 (7th Cir. 2009) (state court's decision on section 2254 review need only be "minimally consistent with the facts and circumstances of the case"); *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (holding that a state court decision must be more than incorrect from the point of view of the federal court; AEDPA requires that it be "unreasonable," "lying well outside the boundaries of permissible differences of opinion").

Under Illinois law, first degree murder occurs when an individual kills another without lawful justification and either intends to kill or do great bodily

13

harm to that person, or knows that his actions will cause death. 720 ILCS § 5/9-1(a)(1). Home invasion occurs when an individual enters an occupied dwelling without authority and intentionally causes injury to the occupant. 720 ILCS § 5/12-11(a)(2).

Here, there was overwhelming evidence presented at trial showing petitioner's guilt. This evidence included: (1) several inculpatory statements by both Petitioner and co-defendant; (2) evidence of a forced entry into the victim's home; (3) eyewitness testimony that Petitioner and Abukhdeir approached the victim's home with a gun; and (4) a gun recovered from Abukhdeir's home that could not be eliminated as the gun used to kill the victim. The evidence at trial also showed that Richmond, Kasper, and Garcia fought with men at Martinez' party and, after leaving the party, Richmond called Petitioner, gave him the victim's address and urged him to retaliate. [14] Ex. A 2-4, Ex. J at 3. After Garcia dropped off Richmond and Kasper, Petitioner and Abukhdeir picked them up and drove to the victim's house. [14] Ex. A at 2. Chrzan, who was with Petitioner when Richmond called, testified that she observed Petitioner take a shotgun from under the bed as he left her house, and Kasper testified that she saw Petitioner retrieve a gun from the trunk when they arrived at the victim's home. *Id.* at 3, 5. Richmond testified that Petitioner and Abukhdeir, with the gun, then walked down a gangway that lead to the rear of the victim's house. *Id.* Richmond testified that when the men returned, Abukhdeir said that Petitioner "ha[d] blood all over him"; that "if it wasn't for [Abukhdeir]," Petitioner "wouldn't have gotten through the back door";

and that he hoped Petitioner "did it right." *Id.* at 3; [14] Ex. J at 3. Richmond testified that as Petitioner was dropping her off, he threatened: "You're my girl but I'll kill you." [14] Ex. A at 3-4. Later that day, Petitioner told Chrzan that he had driven her car to Chicago, that she "wouldn't want to come around anymore" if he told her what had happened, and that "if he ever went to jail for murder, he would kill himself." *Id.* at 5. Police recovered .40 caliber bullets from the victim's body and from the scene, as well as a .40 caliber gun from Abukhdeir's house. *Id.* at 7. Waszak testified that, two days after the murder, Abukhdeir gave him a tied sock containing a .40 caliber gun barrel, spent casings, and live shells, which he then threw into the river to repay the debt he owed to Abukhdeir. Additionally, the back door of the victim's house was split open, suggesting that a forced entry had occurred. [14] Ex. A at 6.

Petitioner argues that none of the State's witnesses heard or saw anyone enter the premise, nor had they heard any gunshots during the time that defendant was out of their sight. He also emphasizes that detectives found no fingerprints, blood evidence, or gunshot residue and no other physical evidence linking Petitioner to Martinez' murder; nor, he argues, was there any ballistic evidence or eye witness testimony tying him to the murder. On cross examination, the assistant medical examiner admitted that she could not determine the exact time of death. The deceased was unnoticed from approximately 4:00 a.m. until approximately 6:00 p.m. on the day of his death. During this time, many other individuals might have had access to the scene. The witness who lived in the basement below did not hear

anyone break into the hour or kick in the door during that time petitioner was in the area; nor did she hear any gunshots. Additionally, the testimony of Richmond and Kasper was allegedly suspect because both women admitted to being drunk at the time. And the testimony of John Waszak was purportedly impeached on a variety of topics, and his testimony was not corroborated by the recovery of the contents of the sock. Petitioner argues that Chrzan's testimony about her conversation with Petitioner (where he told her that she "probably wouldn't want to come around anymore" if she knew what happened, and that "if he ever went to jail for murder, he would kill himself") and his question about "Sally" being registered was vague and inconclusive.

Initially, the lack of physical evidence directing linking Petitioner to the crimes is not dispositive, because circumstantial evidence remains sufficient to support a conviction. *See Clayton v. Gilmore*, No. 94-2167, 1997 WL 267850, at *5 (7th Cir. May 15, 1997) (rejecting sufficiency of the evidence claim on habeas review where "circumstantial evidence was sufficient for a reasonable jury to find [petitioner] guilty"); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction."); *United States ex rel. Green v. Greer*, 667 F.2d 585, 587 n.3 (7th Cir. 1981) (citing *Jackson*, 443 U.S. at 324-25) ("The *Jackson* Court recognized that circumstantial evidence could support a guilty verdict."); *see generally Holland v. United States*, 348 U.S. 121, 140 (1954) (observing that, in criminal cases, circumstantial evidence is "intrinsically no different from testimonial evidence").

Here, the jury heard testimony that Richmond and Kasper got into a fight at Martinez' house; that the argument implicated Petitioner and potentially his race and ended when Howard smacked the women and they left; that the women then called Petitioner and urged him to take action in retaliation; that Petitioner received those calls, then drove with Abukhdeir to pick up the women; that the group then drove to the victim's house, with a gun; that Petitioner and Abukhdeir then walked toward the back of the house, with the gun; that Petitioner returned to the car a short time later, then told his girlfriend that if she knew what had happened, she would not come around anymore; that police recovered a gun from Abukhdeir's house, which forensics could not eliminate as the gun used in the shooting; that Abukhdeir implicated Petitioner by saying that he was covered in blood and that Abukhdeir hoped Petitioner had "done it right"; and that two days after the murder, Abukhdeir asked a mutual friend of his and Petitioner's to get rid of a sock containing a gun barrel and shell casings.

Although Petitioner challenges Richmond's and Kasper's credibility and the weight to be given to Waszak's testimony, it is up to the jury to determine what weight to ascribe in-court testimony—Petitioner cannot subsequently challenge the jury's credibility determinations on habeas review. *See Marshall v. Lonberger,* 459 U.S. 422, 851 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007) ("This Court construes all evidence in the light most favorable to the

government, defers to the jury in assessing credibility, and resolves all conflicts in the evidence in favor of the government."); *United States v. Hopson*, 184 F.3d 634, 636 (7th Cir. 1999) (jurors are "free to believe" whatever evidence is submitted to them, and their "credibility assessments and evidence-weighing" are entitled to deference).

In light of all of this evidence, the Court finds that the state court's rejection of Petitioner's sufficiency challenge was objectively reasonable. As a result, Petitioner's claim one fails.

### B.  Claims Two, Three, and Four

Petitioner next claims that the trial court erred in allowing the admission of: (1) prior consistent statements of six of the State's witnesses (claim 2); (2) a handgun recovered from co-defendant's home and evidence that Petitioner owned a shotgun (claim 3); and (3) evidence that Petitioner was arrested while exiting the Maywood Courthouse (claim 4). As Respondent correctly notes, these claims are procedurally defaulted because Petitioner failed to fairly present them as federal claims in state court.

Inherent "in the habeas petitioner's obligation to exhaust his state court remedies before seeking relief in habeas corpus is the duty to fairly present his federal claims to the state courts." *Lewis v. Sternes,* 390 F.3d 1019, 1025 (7th Cir. 2004) (internal citation omitted); *see also O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999). The fair presentment doctrine requires a petitioner to alert the state court to the federal nature of his claim by identifying "the federal source of law on which

he relies," citing a "case deciding such a claim on federal grounds," or simply labeling the claim "federal." *Baldwin v. Reese,* 541 U.S. 27, 32 (2004). Additionally, it may be possible for Petitioner to frame his issue as federal by citing a lower court opinion that raises a similar federal issue. In order for a case citation to be sufficient to satisfy the fair presentment doctrine, Petitioner must assert, in his Petition, that the case being cited to conducts a federal constitutional analysis. *Id.* at 31. This must be clearly stated as the Court is not required to further read into these lower court opinions to determine the federal nature of the case at hand, as doing so would alter their ordinary review practices and impose a substantial burden upon them. *Id.* at 31.

Here, Petitioner failed to fairly present the federal nature of claims 2, 3, or 4 during his state court proceedings. Rather, he argued his claims within the context of State law only. With regard to claim 2, Petitioner argued that the trial court erred in allowing introduction of hearsay statements that were inadmissible under Illinois law. With regard to claim 3, Petitioner argued that the trial court erred in admitting gun and ballistics evidence because it was inadmissible under Illinois law. As to claim 4, Petitioner argued on direct appeal that the trial court erroneously admitted evidence that petitioner was arrested while exiting a courthouse, raising the inference that he had another criminal case pending at the time; Petitioner argued that this evidence was inadmissible under Illinois law. Petitioner never raised these issues in the context of any federal law or

constitutional provision. In short, Petitioner failed to present any of these issues as a claim for violation of any federal or constitutional right.

Petitioner argues that he fairly presented his claim by citing to cases below that included constitutional analysis. Not so. Petitioner must do more than simply cite a case that conducts a federal analysis. *Baldwin,* 541 U.S. at 31. It must be apparent to the reviewing court that a federal analysis is being raised and that Petitioner is using the case for that reason. *Id.* at 31. An appellate judge is not required to further read into lower court cases to determine the federal nature of the claim. *Id.* at 31. The claim must be clearly framed as having to do with a federal issue in the brief submitted to the court. Claims two, three, and four are thus procedurally defaulted.

C. **Claim Five**

Petitioner next claims that the State's closing and rebuttal arguments were improper and deprived him of a fair trial. Petitioner challenges several aspects of the prosecutor's arguments in this claim, and the Court will address each challenged set of statements in turn. But, at the outset, the Court notes that Petitioner asserted the same challenges on direct appeal, and the Illinois Appellate Court rejected them. As a result, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or unless the state court decision was based upon an unreasonable determination of facts. 28 U.S.C. § 2254(d).

To prevail on a due process claim based on improper statements in closing arguments, a petitioner must demonstrate that the prosecutor's closing arguments were both improper and prejudicial. It is "not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, a petitioner must establish that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. An analysis of prejudice turns upon the following factors: (1) whether the prosecutor misstated the evidence; (2) whether the remarks implicate specific rights of the accused; (3) whether the defense invited the response; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut. *Id*. at 181-82; *see also Ellison v. Acevedo*, 593 F.3d 625, 636 (7th Cir. 2010) (measuring whether state court's application of *Darden* was reasonable under § 2254(d)). The most important factor is the weight of evidence against the petitioner, as "strong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *United States v. Gonzalez*, 933 F.2d 417, 431–32 (7th Cir. 1991).

Petitioner argues that the State impermissibly shifted the burden of proof to the defense by asking during rebuttal "What did he just tell you for an hour and a half? What did he tell you? Who is the killer? Who is the killer?" [1] at 25; [14] Ex. T at 900. Petitioner argues that because this statement was made toward the beginning of the State's closing, it set the tone for the argument and destroyed Petitioner's presumption of innocence. Petitioner also argues that the prosecutor's

statement during rebuttal closing argument that the defense counsel was "snotty," which petitioner characterizes as a personal attack on defense counsel, was improper. [1] at 25-28. Petitioner further alleges that the prosecutor suggested to the jury that defense counsel was wasting the jury's time when defense counsel stated: "Why do you need to hear from anybody at the gas station? So you can be here until 10:00 o'clock tonight again?" [1] at 27; [14] Ex. T at 919. Petitioner asserts that these comments were intended to inflame the passions of the jury but, more importantly, were an attempt to shift the burden of proof from the State to the defense.

The Illinois Appellate Court found that, because defendant's objection to the first set of comments was sustained and because the court instructed the jury to disregard the comments, the comments did not prejudice Petitioner. [14] Ex. A at 18. With regard to the second set of comments, the court determined that Petitioner had failed to object to some of the comments and therefore waived any right to challenge them on appeal. *Id.* at 19. The court nevertheless found that the challenge lacked merit. *Id.* All of these findings were objectively reasonable.

After the first challenged statement, defense counsel objected and the objection was sustained. The judge then stated: "I will instruct the jury to disregard that comment." [14] Ex. T at 900. The jury was properly instructed that the burden of proof rested with the State, and the Court's instructions emphasized that Petitioner and his counsel did not have the burden of proving anything. *See United States v. Glover*, 479 F.3d 511, 520 (7th Cir. 2007) ("If the jury has been properly

instructed as to the burden of proof, a prosecutor may comment on a defendant's failure to present evidence contradicting the government's proof at trial."); *Smith v. Hunt*, 707 F.3d 803, 812 (7th Cir. 2013) ("There is a longstanding presumption that curative instructions to the jury mitigate harm that may otherwise result from improper comments during closing argument."). Additionally, immediately following the sustained objection and instructions to the jury to disregard the comment, the prosecutor clarified for the jury that "petitioner does not have to prove who is the killer." [14] Ex. T at 901.

More importantly, the evidence against Petitioner was overwhelming. The overall record of proceedings supports the conclusion that the challenged comments did not deprive petitioner of a fair trial. *See, e.g., Carter v. Ryker*, No. 10 C 3783, 2011 WL 589687, at *7 (N.D. Ill. Feb. 9, 2011) (prosecutor's closing argument remarks that allegedly shifted burden of proof did not prejudice petitioner where defense counsel invited remarks and judge instructed jury regarding defendant's presumption of innocence, State's burden of proof, and that closing arguments are not evidence); *see also Hough v. Anderson*, 272 F.3d at 903-04 (no due-process violation where judge instructed jury that closing arguments are not evidence and prosecutor's remarks did not misstate evidence or implicate a specific right, although defense counsel did not invite remarks and did not have opportunity to rebut); *United States v. Brisk*, 171 F.3d 514, 524-25 (7th Cir. 1999) (no due-process violation where majority of *Darden* factors weighed against finding of unfair trial,

including strong evidence of guilt and jury instruction that closing arguments are not evidence).

Petitioner next claims that the prosecutor made improper comments about Petitioner's motive to commit the crimes charged. At trial, the State suggested that Petitioner was motivated to commit the crimes charged by a desire to seek revenge over a perceived racial insult. Defense counsel objected to these comments, but the trial court overruled the objection. Petitioner argues that these comments lacked any foundation in the evidence. The Illinois Appellate Court considered this claim and determined that the prosecutor's comments were founded in a proper inference to be drawn from the record. [14] Ex. A at 18. This finding was objectively reasonable.

Prosecutors are permitted to argue "reasonable inferences from the evidence that the jury has seen and heard." *United States v. Klebig*, 600 F.3d 700, 718 (2009). Prosecutors may argue reasonable inferences from evidence the jury has heard but cannot "infuse their closing arguments with facts that the court has not admitted into evidence." *United States v. Cornelius,* 623 F.3d 486, 598 (7th Cir. 2010). At trial, the State presented evidence of an argument between Martinez' friends on one side and Petitioner's girlfriend and her friends on the other; the argument started when the men heard Kasper complaining about her boyfriend being with another woman. During this argument, one of the men asked Kasper why she was dating "a black guy," and the women called the men derogatory names referring to Hispanic men. As the women were leaving, one of Martinez' friends

smacked them.  The women then called Petitioner and urged him to take action in retaliation.  [14] Ex. A at 2-6.  Taken together, this evidence supports a reasonable inference that the crimes may have been racially motivated.  As a result, the Court cannot say that the prosecutor's comments were improper, and this Court rules that the state court's findings on the issue were reasonable.

Finally, Petitioner argues that the prosecutor's rebuttal comments about statements made by Abukhdeir to Waszak were not supported by the evidence. Specifically, petitioner challenges the following remarks: "What was the date that John Waszak told you he talked to the police?  And what was the date that John Waszak told you that co-defendant Mohammed bragged about the bloody pants not being the right pants?"  [14] Ex. T at 903.  During trial, defense counsel objected to these statements and requested a sidebar.  After admonishing the prosecutor at sidebar that her statements relating to evidence that had been admitted with respect to Abukhdeir only and not with respect to Petitioner, the trial court instructed the jury as follows: "What was allegedly said by Mohammed Abukhdeir to Waszak is not evidence before this jury; so I'll strike counsel's comments and instruct you to disregard it."  *Id*. at 907.  The court's instructions here effectively mitigated any potential harm stemming from the prosecutor's comments.  *See Smith*, 707 F.3d at 812.

D.  **Claims Six and Seven**

In claims six and seven, Petitioner argues that his trial counsel was constitutionally ineffective because counsel: (1) deprived Petitioner of his right to

testify (claim 6); and (2) failed to call William "Billy" Thompson to contradict testimony by State witness John Waszak. The trial court dismissed Petitioner's ineffective assistance of counsel claim on the merits, and the Illinois Appellate Court determined on post-conviction review that trial counsel's performance was not constitutionally deficient. [14] Ex. J at 10-16. Because the state courts adjudicated Petitioner's claims on the merits, this Court's review of the claims is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the AEDPA, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or unless the state court decision was based upon an unreasonable determination of facts. 28 U.S.C. § 2254(d).

Claims of ineffective assistance of counsel are first analyzed under the two-part test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland,* Petitioner must demonstrate that: (1) his trial counsel's performance was deficient; and (2) but for his counsel's alleged errors, there is a reasonable probability that the outcome of the trial would have been different, *i.e.,* prejudice. *Id. at* 687, 695. To demonstrate performance deficiency, Petitioner must establish that his counsel's performance fell below an objective standard of reasonableness and that he was prejudiced as a result. *Lee v. United States,* 137 S.Ct. 1958, 1964 (2017). Judicial scrutiny of a defense counsel's performance must be "highly deferential" and a reviewing court must indulge a "strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (internal quotation marks and citation omitted). Thus, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

In terms of prejudice, a reasonable probability "is a probability sufficient to undermine the confidence in the outcome." *Strickland,* 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, the court need not consider the quality of the attorney's performance. *See id.* at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Additionally, under the AEDPA, Petitioner must not only satisfy the *Strickland* standard *de novo*, but also establish that the state court's application of *Strickland* was unreasonable, "a 'doubly deferential' standard of review that gives both the state court *and* the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)) (emphasis added).

In claim 6, Petitioner argues that his trial counsel was ineffective for refusing to call Petitioner to testify and denying him his constitutional right to testify on his own behalf. [1] at 29. Petitioner claims that his attorney told him that he would "get his chance" when the judge admonished him about his right to testify, but that

27

this admonishment never occurred. *Id.* At 30. Petitioner further alleges that he again told his counsel after the State rested that he wished to testify, but that his counsel refused his request. *Id.*

A defendant's right to testify at trial is a fundamental constitutional right, as is his or her right to choose not to testify. *Thompson v. Battaglia,* 458 F.3d 614, 619 (7th Cir. 2006). The decision "not to place the defendant on the stand is a classic example" of a strategic trial decision, for purposes of a claim of ineffective assistance of counsel. *United States v. Stuart*, 773 F.3d 849, 853 (7th Cir. 2014). "Under Illinois Law, a criminal defendant's 'conviction cannot be reversed on the basis that he was prevented from exercising that right unless he contemporaneously asserted his right to testify by informing the trial court that he wished to do so.'" *U.S. ex rel. Owens v. Acevedo*, No. 08 C 7159, 2012 WL 1416432, at *14 (N.D. Ill. May 29, 2012) (quoting *People v. Smith*, 680 N.E.2d 291, 302 (Ill. 1997) and citing *Thompson v. Battaglia*, 458 F.3d 614, 619 (7th Cir. 2006) (recognizing Illinois as among the jurisdictions that require "a defendant to protest a lawyer's refusal to allow her to testify during trial to preserve the right")). When a defendant's post-conviction claim that his "trial counsel was ineffective for refusing to allow the defendant to testify is dismissed, the reviewing court must affirm the dismissal unless, during the defendant's trial, the defendant made a 'contemporaneous assertion of his right to testify.'" *People v. Youngblood*, 389 Ill. 2d 209, 217 (2009) (quoting *People v. Brown*, 54 Ill. 2d 21, 24 (1973)).

Although Petitioner's habeas petition does not detail what his testimony would have been, had he been permitted by his counsel to testify, an affidavit attached to his amended post-conviction petition does set forth his potential testimony regarding the night of January 4, 2004. [14] Ex. W at 107-09. According to this affidavit, Petitioner would have testified that he spent the night with Abukhdeir and Chrzan; that he received phone calls from Richmond and Kasper around 4:45 a.m., but did not pick them up; that he left Chrzan to go home and sleep in his bedroom in Oak Park; that he then drove towards downtown Chicago, but decided to turn around and return to his house; and that, from that point on, he was home alone and did not speak to anyone, other than receiving a call from Chrzan after 8:00 a.m. asking where he was. *Id.* at 107-108. Petitioner argues that if he had been able to testify to these facts, he would have been able to cast the circumstantial evidence presented by the state in a different light, which would have led to a different outcome in his case.

There is nothing in the record, however, to suggest that Petitioner ever asked to testify and was thereafter denied the opportunity to do so. In the absence of a contemporaneous assertion by petitioner of his right to testify, the trial court properly rejected this post-conviction claim. *E.g., Owens*, 2012 WL 1416432, at *14. Beyond his own self-serving affidavit, Petitioner failed to present "something more, such as an affidavit from the lawyer" establishing that counsel refused to let him testify. *Thompson*, 458 F.3d at 619; *see also Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991) ("The defendant must produce something more than a bare,

unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand.").

Nor has Petitioner shown that there was a reasonable probability that his proposed testimony would have resulted in a different outcome. Had Petitioner been permitted to testify as his affidavit suggests, his testimony would have been one more piece in the puzzle, but the jury nonetheless heard testimony from numerous other witnesses flatly contradicting Petitioner's story. Richmond testified that she did speak with Petitioner by phone after the party, that Petitioner came and got her and Kasper, and that they drove to the victim's house. Chrzan testified that Petitioner did pick up his phone and phone records confirmed the calls between Petitioner and Richmond. Petitioner does not explain why the jury would have disregarded all of this evidence in favor of his testimony.

In claim 7, Petitioner argues that trial counsel was ineffective for failing to call William "Billy" Thompson to testify on Petitioner's behalf. [1] at 32-33. According to Petitioner, Thompson was prepared to testify that John Waszak was not at Thompson's house on January 6, 2004 because Waszak "is a drug addict and a thief and is not welcome there." *Id.* Petitioner claims that Thompson's testimony would have directly contradicted Waszak's testimony that he was at Thompson's house on January 6, 2004 when Abukhdeir purportedly gave him the knotted sock containing the .40 caliber handgun. *Id.* at 33.

The Constitution does not require counsel to present "each and every witness that is suggested to him." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005).

"If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic." *United States v. Berg*, 714 F.3d 490, 499 (7th Cir. 2013). Thus, counsel's decision whether to call a witness is "generally not subject to review." *Id.*; *see Gentry v. Sevier*, 597 F.3d 838, 851 (7th Cir. 2010) ("Second-guessing strategic decisions in hindsight will generally not be a meritorious basis to find ineffective assistance of counsel."); *United States v. Weaver*, 882 F.2d 1128, 1139 (7th Cir. 1989) ("It would be a rare case where counsel's conscious decision not to call a witness would amount to constitutionally ineffective assistance."). To prove counsel was ineffective for failing to call a specific witness, a petitioner must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *United States ex rel. Par. v. Hodge,* 73 F. Supp. 3d 895, 903 (N.D. Ill. 2014).

Here, Petitioner asserts that Waszak's testimony provided a "critical link" between the .40 caliber gun and Petitioner and Abukhdeir. Petitioner argues that no sound trial strategy would have allowed this piece of evidence to be admitted without attacking it. Yet the record shows that defense counsel did attack it: specifically, counsel weakened the impact of Waszak's testimony by cross-examining Wazak concerning his extensive criminal history, including his forgery charge, and his recent drug use. Counsel also highlighted the inconsistencies between what Waszak told the jury at trial and what Waszak told the police at the time of the investigation. In short, counsel exposed Waszak as a drug use, a liar, and a criminal—without calling Thompson. As a result, Petitioner fails to show what

Thompson could have added to the defense or that Thompson's testimony would have done anything to change the outcome of the proceedings.

Petitioner emphasizes that Thompson did testify on behalf of Abukhdeir, and that Abukhdeir was acquitted, whereas Petitioner was convicted. On the record before the Court, however, it is not possible to draw a link between Thompson's testimony and the jury's verdict. Indeed, that was not the only difference in the evidence presented to the co-Defendants' respective juries.

## IV. Certificate of Appealabilty

The Court declines to issue a certificate of appealability under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts. Petitioner cannot make a substantial showing of the denial of a constitutional right, nor can he show that reasonable jurists would debate (much less disagree), with this Court's resolution of this case. *Resendez v. Knight*, 653 F.3d 445, 446-47 (7th Cir. 2011) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights, but if he wishes to do so, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule

59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon, but only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## V. Conclusion

For the reasons explained above, Petitioner's habeas corpus petition [1] is denied, and the Court declines to issue a certificate of appealability. The Clerk is instructed to enter a judgment in favor of Respondent and against Petitioner. On the Court's own motion, Respondent Randy Pfister is terminated and Karen Jaimet, the Warden of Petitioner's current place of custody, Pinckneyville Correctional Center, is added as Respondent. The Clerk shall alter the case caption to *Hartsfield v. Jaimet*. Civil case terminated.

Dated: March 6, 2018

ENTERED:

John Robert Blakey
United States District Judge